IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

_____

|  |  |  |
|---|---|---|
| ASIA WHEEL CO., LTD, *ET AL.*, | ) | |
|     Plaintiffs, | ) | |
| | ) | |
|     and | ) | |
| | ) | |
| TEXTRAIL, INC., | ) | |
|     Plaintiff-Intervenor, | ) | |
| | ) | |
|     v. | ) | Consol. Court No. 23-00096 |
| | ) | |
| UNITED STATES, | ) | |
|     Defendant, | ) | |
| | ) | |
|     and | ) | |
| | ) | |
| DEXSTAR WHEEL DIVISION OF | ) | |
| AMERICANA DEVELOPMENT, INC., | ) | |
|     Defendant-Intervenor. | ) | |
| _____ | ) | |

**DEFENDANT'S OPPOSITION TO PLAINITFFS' AND PLAINTIFF-INTERVENOR'S
MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

STEPHEN C. TOSINI
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-5196
Email: stephen.tosini@usdoj.gov
Attorneys for Defendant

OF COUNSEL:

BRISHAILAH BROWN
Attorney
Office of the Chief Counsel for Trade
Enforcement and Compliance
United States Department of Commerce

March 8, 2024

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ................................................................2

I.    The Administrative Determination Under Review ...........................................2

II.   Issue Presented For Review .............................................................................2

STATEMENT OF FACTS ..................................................................................................2

I.    Antidumping Duty And Countervailing Duty Determinations.............................2

II.   The Antidumping and Countervailing Duty Orders .........................................5

III.  Scope Proceedings ..........................................................................................6

SUMMARY OF THE ARGUMENT ..................................................................................8

ARGUMENT ......................................................................................................................9

I.    Legal Standards..............................................................................................9

      A.    Standard For Judicial Review Of Scope Determinations .......................9

      B.    Legal Framework For Scope Rulings ..................................................10

II.   Commerce's Scope Determination Was Lawful..............................................12

      A.    Commerce Reasonably Found That The Scope Was Ambiguous........................12

      B.    Commerce Explained That It Was Not Deciding Hypothetical Situations Such As
            Those In This Case When It Issued The Orders ....................................14

      C.    Commerce Reasonably Determined That Asia Wheel's Steel Wheels Were Not
            Substantially Transformed By Processing In Thailand, And Thus, Remained
            Chinese Country Of Origin And Subject To The Orders ......................16

            1.    Legal Framework for Substantial Transformation Analyses....................17

            2.    Commerce Lawfully Conducted Its Substantial Transformation
                  Analysis..........................................................................................18

D.      Commerce's Application Of Antidumping And Countervailing Duty Liability To
        The Entire Imported Wheel Is Supported By Substantial Evidence And In
        Accordance with Law ............................................................................................24

E.      Commerce Provided Lawful Notice That Wheels Produced In Third Countries
        From Chinese Origin Components Could Be Subject Merchandise ....................30

# TABLE OF AUTHORITIES

**Cases**

*Adams v. U.S. Forest Serv.*,
  671 F.3d 1138 (9th Cir. 2012) ............................................................. 13

*Advanced Tech & Materials Co. v. United States*,
  35 Ct. Int'l Trade 1380 (2011) .......................................................... 17

*Al Ghurair Iron & Steel LLC v. United States*,
  536 F. Supp. 3d 1357 (Ct. Int'l Trade 2021), *aff'd*, 65 F.4th 1351 (Fed. Cir. 2023) ............... 28

*Allegheny Bradford Corp. v. U.S.*,
  342 F. Supp. 2d 1172 (Ct. Int'l Trade 2004) ................................................ 26, 27

*Am. Silicon Techs. v. United States*,
  261 F.3d 1371 (Fed. Cir. 2001) .......................................................... 10

*ArcelorMittal Stainless Belgium N.V. v. United States*,
  694 F.3d 82 (Fed. Cir. 2012) ....................................................... 11, 12

*Bell Supply Company LLC v. United States*,
  888 F.3d 1222 (Fed. Cir. 2018) ..................................................... *passim*

*Bell Supply LLC. v. Unitedd States*,
  348 F. Supp. F.3d 1281 (Ct. Int'l Trade 2018) ........................................ *passim*

*Bestfoods v. United States*,
  165 F.3d 1371 (Fed. Cir. 1999) .......................................................... 17

*Canadian Solar, Inc. v. United States*,
  918 F.3d 909 (Fed. Cir. 2019) ............................................................ 20

*Chr. Bjelland Seafoods A/S v. United States*,
  19 C.I.T. 35 (1995) ..................................................................... 26

*Consol. Edison v. NLRB*,
  305 U.S. 197 (1938) ...................................................................... 9

*Cormorant Shipholding Corp. v. United States*,
  617 F. Supp.2d 1270 (Ct. Int'l Trade 2009) ............................................... 13

*Crawfish Processors Alliance v. United States*,
  483 F.3d 1358 (Fed. Cir. 2007) ........................................................... 9

*Diamond Tools Tech. LLC v. United States*,
  545 F. Supp. 3d 1324 (Ct. Int'l Trade 2021) ............................................. 35

*Doughten Seed Co. v. United States,*
    24 C.C.P.A. 258 (1936) ............................................................................... 13

*E.l. DuPont de Nemours & Co. v United States,*
    8 F. Supp. 2d 854  (Ct. Int'l Trade 1998) ................................................ 17, 18 19

*Eckstrom Industries, Inc. v. United States,*
    254 F.3d 1068 (Fed. Cir. 2001) ................................................................. 25

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996) ................................................................... 10

*Goldlink Indus. Co. v. United States,*
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ........................................... 10

*Huayin Foreign Trade Corp. v. United States,*
    322 F.3d 1369 (Fed. Cir. 2003) ................................................................. 12

*King Supply Co. LLC v. United States,*
    674 F.3d 1343 (Fed. Cir. 2012) ................................................................. 10

*MacDonald v. Pan Am. World Airways, Inc.,*
    859 F.2d 742 (9th Cir. 1988) .................................................................... 13

*Mid Continent Nail Corp. v. United States,*
    725 F.3d 1295 (Fed. Cir. 2013) ..................................................... 10, 29, 30

*Mitsubishi Elec. Corp. v. U.S.,*
    802 F. Supp. 455 (Ct. Int'l Trade 1992) .............................................. 26, 27

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. et al., v. State Farm Mutual Automobile Insurance*
    *Company,*
    *et al.*, 463 U.S. 29 (1983) ..................................................................... 26, 27

*Peer Bearing Co.-Changshan v. United States,*
    128 F. Supp. 3d 1286 (Ct. Int'l Trade 2015) ........................................... 23

*Sandvik Steel Co. v. United States,*
    164 F.3d 596 (Fed. Cir. 1998) ................................................................... 10

*Sango Int'l L.P. v. United States,*
    484 F.3d 1371 (Fed. Cir. 2007) ................................................................. 9

*Sunpreme Inc. v. United States,*
    946 F.3d 1300 (Fed. Cir. 2020) ................................................................. 34

*Tai-Ao Aluminum (Thaishan) Co.. v. United States,*
    983 F.3d 487 (Fed. Cir. 2020) ............................................... 30, 31, 32, 33

*Tak Fat Trading Co. v. United States,*
    396 F.3d 1378 (Fed. Cir. 2005) ........................................................................ 11

*Trans Texas Tire, LLC v. United States*,
    519 F. Supp. 3d 1289 (Ct. Int'l Trade 2021) .............................................. 31, 32

*Ugine and ALZ Belgium, N.V. v. United States*,
    517 F. Supp. 2d 1333 (Ct. Int'l Trade 2007) .................................................. 17

*United States v. Jones*,
    60 F.4th 230 (4th Cir. 2023) ................................................................. 13, 14, 15

*United States v. Pulsifer*,
    39 F.4th 1018 (8th Cir. 2022) .......................................................................... 13

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951) ......................................................................................... 10

*USX Corp. v. United States*,
    655 F. Supp. 487 (Ct. Int'l Trade 1987) .................................................... 26, 28

*Walgreen Co. of Deerfield, IL v. United States*,
    620 F.3d 1350 (Fed. Cir. 2010) .............................................................. 4, 28, 29

**Statutes**

5 U.S.C. § 706 ............................................................................................................ 27

19 U.S.C. § 1516a(b)(1)(B) ......................................................................................... 9

19 U.S.C. § 1517(e) .......................................................................................... *passim*

**Regulations**

19 C.F.R. § 351.225(a) ............................................................................................... 10

19 C.F.R. § 351.225(d) .......................................................................................... 10, 11

19 C.F.R. § 351.225(e) ............................................................................................ 6, 11

19 C.F.R. § 351.225(k) ..................................................................................... 10, 11, 16

**Administration Determinations**

*Aluminum Extrusions from the People's Republic of China:  Initiation of Anti-Circumvention Inquiry*,
    81 Fed. Reg. 15,039 (Dep't of Commerce Mar. 21, 2016) ........................................................ 32

*Aluminum Extrusions from the People's Republic of China: Affirmative Preliminary Determination of Circumvention*,
    81 Fed. Reg. 79,444 (Dep't of Commerce Nov. 14, 2016).......................................................33

*Amended Final Determination and Antidumping Duty Order:  Certain Welded Stainless Steel Butt-Weld Pipe Fittings from Taiwan*,
    58 Fed. Reg. 33,250 (Dep't of Commerce June 16, 1993)........................................................ 27

*Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination*,
    84 Fed. Reg. 5,989 (Dep't of Commerce February 25, 2019) .................................................... 2

*Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China: Notice of Covered Merchandise Referral*,
    86 Fed. Reg. 10,245 (Dep't of Commerce Feb. 19, 2021)......................................................... 7

*Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, and Preliminary Affirmative Determination of Critical Circumstances*,
    84 Fed. Reg. 16,643 (Dep't of Commerce April 22, 2019)......................................................2

*Certain Steel Trailer Wheels 12 to 16.5 Inches from the People's Republic of China: Antidumping Duty and Countervailing Duty Orders*,
    84 Fed. Reg. 45, 952 (Dep't of Commerce Sept. 3, 2019) (*Orders*). ............................. *passim*

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

_____
                                                    )
ASIA WHEEL CO., LTD, *ET AL*.,                       )
                                                    )
     Plaintiffs,                                    )
                                                    )
     and                                            )
                                                    )
TEXTRAIL, INC.,                                     )
                                                    )
     Plaintiff-Intervenor,                          )
                                                    )
     v.                                             )    Consol. Court No. 23-00096
                                                    )
UNITED STATES,                                      )
                                                    )
     Defendant,                                     )
                                                    )
     and                                            )
                                                    )
DEXSTAR WHEEL DIVISION OF                           )
AMERICANA DEVELOPMENT, INC.,                        )
                                                    )
     Defendant-Intervenor.                          )
_____)

## **ORDER**

On consideration of the motion for judgment on the administrative record filed by consolidated plaintiffs and plaintiff-intervenors, defendant's response, and all other pertinent papers, it is hereby

     ORDERED that the motion is denied; and is further

     ORDERED that judgment is entered for the United States.


Dated: _____       _____
     New York, NY                                          JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| ASIA WHEEL CO., LTD, *ET AL*., | ) |
| Plaintiffs, | ) |
| and | ) |
| TEXTRAIL, INC., | ) |
| Plaintiff-Intervenor, | ) |
| v. | )   Consol. Court No. 23-00096 |
| UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| DEXSTAR WHEEL DIVISION OF AMERICANA DEVELOPMENT, INC., | ) |
| Defendant-Intervenor. | ) |

**DEFENDANT'S OPPOSITION TO PLAINITFFS' AND PLAINITFF-INTERVENOR'S MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, defendant, the United States, respectfully requests that the Court sustain the Department of Commerce's (Commerce) antidumping and countervailing duty scope determination on steel wheels from China.  Commerce lawfully interpreted the scope of the orders to cover steel wheels assembled in third countries for which one of the two main components (rim/disc) originated in China.  When it issued the orders, Commerce instructed interested parties that it might adopt this interpretation in the future and reasonably interpreted the orders' scope in response to a proposed

interpretation that significantly dilutes the protection afforded to United States manufacturers under the unfair trade laws.

## STATEMENT PURSUANT TO RULE 56.2

### I.    The Administrative Determination Under Review

The administrative Determination under review is *Memorandum, RE: Final Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand (Asia Wheel)* (A-570-090, C-570-091) (Dep't of Commerce Apr. 11, 2023) (Final Scope Ruling), Appx2782-2853.

### II.    Issue Presented For Review

1.  Whether Commerce's determination that Asia Wheel's trailer wheels processed in Thailand from Chinese rims or discs are subject to the orders is supported by substantial evidence and in accordance with law.

2.  Whether Commerce lawfully declined to instruct U.S. Customs and Border Protection (CBP) to lift the suspension of liquidation that that agency had imposed on entries of covered merchandise pursuant to its own authority under the Enforce and Protect Act (EAPA), 19 U.S.C. § 1517(e).

## STATEMENT OF FACTS

### I.    Antidumping Duty And Countervailing Duty Determinations

In February 2019 and April 2019, respectively, Commerce published preliminary determinations in the countervailing duty (CVD) and antidumping duty (AD) investigations of certain steel wheels 12 to 16.5 inches in diameter from China. *Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination*, 84 Fed. Reg. 5,989 (Dep't of Commerce Feb. 25, 2019) (Preliminary CVD Determination); *Certain Steel Wheels 12 to 16.5 Inches in Diameter from the*

*People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, and Preliminary Affirmative Determination of Critical Circumstances*, 84 Fed. Reg. 16,643 (Dep't of Commerce April 22, 2019) (Preliminary AD Determination).

At that time, Commerce also issued a preliminary scope decision that modified their scopes. Appx80028-80039 (Preliminary Scope Investigation Memorandum). In its comments submitted before the preliminary scope decision, the petitioner, Dexstar Wheel Division of Americana Development, Inc. (Dexstar) requested that the scope be amended to clarify the country-of-origin criteria that would be applied when covered merchandise undergoes further processing in a third country. Dexstar requested that the following language be added to the scope of the investigations:

> The scope includes rims, discs, and wheels that have been further processed in a third country, including, but not limited to, the welding and painting of rims and discs to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the investigations if performed in the People's Republic of China.

Appx80035.

Commerce agreed to add clarifying language to ensure that the scope language reflected Dexstar's intention of including rims and discs from China that have been further processed in a third country into finished steel wheels within the scope. Appx80035-80036.

In its final scope decision, Commerce considered issues concerning third country assembly raised by parties in their case briefs. Appx80015-80025 (Final Scope Investigation Memorandum). Respondents had requested that Commerce confirm that wheels comprised of rims *or* discs from China that are assembled in a third country with rims or discs from third countries are not within scope, on the basis that such products are not lawfully subject merchandise because they are not products of China but rather are products of the third country.

3

Appx80018.  They had contended that only Chinese rims and discs assembled in third countries

were within scope.  *Id*.  Dexstar asserted that the language of the scope is expansive; it includes

rims, discs, and wheels and does not limit processing, and if the processing is performed in

China, this will not remove it from scope.  Dexstar further argued that this broad language

corresponds to its intent as expressed in the petition – that either a rim or a disc from China

would be covered by these investigations, not only a rim and a disc together.  Appx80019.

Commerce determined that the plain language of the preliminary scope clarification, as

provided by Dexstar and adopted by Commerce after the preliminary scope finding for the

investigations, "addresses instances in which an unassembled steel wheel is assembled (and

painted or otherwise finished) in a third country from necessary constituent parts of said wheel:

rims and discs, *i.e*., an unassembled steel wheel (the scope elsewhere contemplates that subject

wheels may be imported as an assembly, unassembled, or separately, but is again clear that such

imports of unassembled wheels include rims and discs)."  Appx80021.

Commerce declined to add further clarifications because the current scope language

reflected the intent of Dexstar to foreclose a potential avenue of circumvention by including

within the scope where there is assembly and finishing of steel wheels in a third country from

constituent parts produced in China.  *Id*.  Notably, Commerce declined Dexstar's request to

modify the part of the scope language to use the word "or" instead of "and."  *Id*.

In these circumstances, Commerce found that the use of the word "'or' would be

selectively exclusionary and inconsistent with meaning of the word 'and.'"  Appx80022.

Conversely, Commerce declined respondents' request to "explicitly confirm that only rims and

discs from China assembled into wheels in third countries are within scope."  *Id*.  Although

Commerce found that its interpretation of "rims and discs" was "consistent with the reasonable

interpretation of the existing language as it was seemingly understood by all parties, including

Commerce, to this point," it also "did not foreclose a further analysis of substantial

transformation should a product be completed in a third country from a mix of rim and disc parts

from China and a third county, if an interested party requests a scope ruling and/or to address a

future circumvention concern."  *Id*.  Commerce thus found "that the current scope language is

clear that only if all constituent rim and disc parts to form a steel wheel are from China does the

order apply *notwithstanding any analysis of substantial transformation.*"  *Id*. (emphasis added).

## II.    <u>The Antidumping and Countervailing Duty Orders</u>

In September 2019, Commerce issued the orders on certain steel wheels from China.

*Certain Steel Trailer Wheels 12 to 16.5 Inches from the People's Republic of China:*

*Antidumping Duty and Countervailing Duty Orders*, 84 Fed. Reg. 45, 952 (Dep't of Commerce

Sept. 3, 2019) (*Orders*).  The products subject to these *Orders* are:

> Certain on-the-road steel wheels with a nominal wheel diameter of
> 12 inches to 16.5 inches within the scope are generally for road
> and highway trailers and other towable equipment, including, inter
> alia, utility trailers, cargo trailers, horse trailers, boat trailers,
> recreational trailers, and towable mobile homes. The standard
> widths of certain on-the-road steel wheels are 4 inches, 4.5 inches,
> 5 inches, 5.5 inches, 6 inches, and 6.5 inches, but all certain on-
> the-road steel wheels, regardless of width, are covered by the
> scope.
>
> The scope includes rims and discs for certain on-the-road steel
> wheels, whether imported as an assembly, unassembled, or
> separately. The scope includes certain on-the-road steel wheels
> regardless of steel composition, whether cladded or not cladded,
> whether finished or not finished, and whether coated or uncoated.
> The scope also includes certain on-the-road steel wheels with discs
> in either a "hub-piloted" or "stud-piloted" mounting configuration,
> though the stud-piloted configuration is most common in the size
> range covered.
>
> The Orders apply to rims, discs, and wheels from China that meet
> the physical description even if it's exported to a third country for

additional processing, so long as the product meets the physical
description after third-country processing:

The scope includes rims, discs, and wheels that have been further
processed in a third country, including, but not limited to, the
painting of wheels from China and the welding and painting of
rims and discs from China to form a steel wheel, or any other
processing that would not otherwise remove the merchandise from
the scope of the Orders if performed in China.

### III.    <u>Scope Proceedings</u>

On November 11, 2020, Asia Wheel asked Commerce to determine whether certain types
of trailer wheels that it manufactures in its facilities in Thailand and exports to the United States
are covered by the scope of the orders.  Appx80000-80077.  Asia Wheel identified three different
production methods (Production Methods A, B, and C) as subject to the request.

- **Production Method A**: Trailer wheels manufactured using discs from China and rims
  produced in Thailand from rectangular steel plates from China or a third country.

- **Production Method B**: Trailer wheels manufactured using discs produced in Thailand
  from circular steel plates from China or a third country and rims produced in Thailand
  from rectangular steel plates from China or a third country.

- **Production Method C**: Dual wheels manufactured using discs produced in Thailand
  from disc blanks from China and rims from China.

In response, Commerce initiated a formal scope inquiry pursuant to 19 C.F.R.
§ 351.225(e).  Appx1410-1411.

The following month, CBP submitted to Commerce a "covered merchandise referral" in
EAPA Investigation No. 7459 requesting that Commerce determine whether certain types of
trailer wheels produced in Thailand from inputs sourced from China are within the scope of the
orders.  Commerce published a notice of this referral in the Federal Register, explaining that the

subject of the covered merchandise referral request was currently under consideration and would be addressed as a part of Asia Wheel Co., Ltd.'s scope ruling request in the ongoing scope segments of the AD and CVD proceedings. *Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China: Notice of Covered Merchandise Referral*, 86 Fed. Reg. 10,245 (Dep't of Commerce Feb. 19, 2021) (Appx1382-1388).

Commerce issued its Preliminary Scope Ruling, finding that trailer wheels that Asia Wheel manufactures in its facilities in Thailand and exports to the United States and described in its scope requests as manufactured pursuant to Production Method B are out-of-scope, whereas the trailer wheels that Asia Wheel manufactures in its facilities in Thailand and exports to the United States and manufactured pursuant to Production Methods A and C are in-scope. Appx2442-2473 (Prelim. Scope Ruling).

Commerce determined that a plain reading of the scope language reflects that rims, discs, and wheels further processed in a third country are covered by the scope if the processing would not otherwise exclude these items from the scope had the processing occurred in China. Appx2454. Commerce found that a totality of the circumstances supported a finding that finished wheels produced under Production Methods A and C are not substantially transformed by processing in Thailand and remain Chinese-origin wheels because (1) the components are of the same class or kind as Chinese-origin wheels; (2) they maintain their essential characteristics; (3) the processing steps of finishing the components into a finished wheel in Thailand are relatively minor; and (4) Asia Wheel's investment in trailer wheel production is not comparable to the investment into production facilities involved in producing the components in China even assuming that the Thai production adds a not insignificant amount of value. Appx2461.

Upon review of the record and the parties' case and rebuttal briefs, Commerce issued its Final Scope Ruling, continuing to find that the trailer wheels manufactured by Asia Wheel in Thailand using Production Methods A and C are in-scope. Appx2782-2853. Commerce also continued to find trailer wheels manufactured using Production Method B out-of-scope.

In response to Asia Wheel's assertion that Commerce must not continue the suspension of liquidation with respect to Production Methods A and C, Commerce explained that CBP suspends liquidation under interim measures pursuant to 19 U.S.C. § 1517(e), based on its own authority, not that of Commerce. Appx2824. Commerce instructed CBP to continue to suspend liquidation of entries of trailer wheels produced under Production Methods A and C as of the date of the initiation of the scope inquiry (March 22, 2021) consistent with 19 C.F.R. § 351.225(l)(3), and did not order any retroactive suspension of liquidation, that is, before initiation. Appx2821.

## SUMMARY OF THE ARGUMENT

Commerce lawfully found that Asia Wheel's imported steel wheels manufactured outside China where one of the two primary components was of Chinese origin are subject to the orders.

First, Commerce reasonably found that the orders are ambiguous with respect to whether they cover wheels manufactured using either Chinese rims or discs.

Second, and contrary to the theme running through Asia Wheel's brief, Commerce made clear that it was withholding decision on whether hypothetical wheels such as those at issue here would be subject to the orders. At the time, Commerce explained that the orders do not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country if an interested party requests a scope review. Accordingly, Commerce recognized that such merchandise, if ever produced,

might fall within the penumbra of the orders, which covered rims, discs, and wheels further processed in a third country if such processing would not otherwise exclude these items had the processing occurred in China.

Third, Commerce reasonably applied its Court-approved substantial transformation analysis to determine the country of origin for the subject products.  Commerce found that (1) the components are of the same class or kind; (2) the merchandise maintains its essential characteristics; (3) the nature and sophistication of the processing in Thailand is minor; (4) the investment into the production of trailer wheels is not comparable to the investment for producing component parts; and (5) the preceding factors weigh in favor of finding no substantial transformation, even assuming that the value added in Thailand is not insignificant. Therefore, after considering the totality of the record evidence, Commerce reasonably concluded that the wheels are not substantially transformed by the completion process in Thailand.

Fourth, plaintiffs fail to provide any support for their theory that duties should be levied on component parts and not the entirety of the wheel.

Fifth, Commerce provided adequate notice and did not violate plaintiffs' due process rights when it instructed CBP to continue the suspension of liquidation for products found to be covered by the orders, if already suspended, and if not already suspended, to suspend liquidation of entries of products found to be in scope effective to the date of initiation.

## ARGUMENT

### I.    Legal Standards

#### A.    Standard For Judicial Review Of Scope Determinations

This Court "must uphold a scope ruling unless {it finds the ruling} to be 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'"  *Sango Int'l L.P. v. United States,* 484 F.3d 1371, 1378 (Fed. Cir. 2007) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

"'Substantial evidence' means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Crawfish Processors Alliance v. United States,* 483 F.3d 1358, 1361 (Fed. Cir. 2007) (quoting *Consol. Edison v. NLRB,* 305 U.S. 197, 229 (1938); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951) ("{s}ubstantial evidence is more than a mere scintilla").

"Even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence." *Am. Silicon Techs. v. United States,* 261 F.3d 1371, 1376 (Fed. Cir. 2001) (citing *Fujitsu Gen. Ltd. v. United States,* 88 F.3d 1034, 1044 (Fed. Cir. 1996)). "{T}he Court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *Goldlink Indus. Co. v. United States,* 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (citations and internal quotations omitted).

The Court grants "significant deference to Commerce's interpretation of a scope." *Mid Continent Nail Corp. v. United States,* 725 F.3d 1295, 1300 (Fed. Cir. 2013) (citation omitted). This is because scope rulings involve "highly fact-intensive and case-specific determination{s}," *King Supply Co. LLC v. United States,* 674 F.3d 1343, 1345 (Fed. Cir. 2012), making it "particularly within {Commerce's} expertise." *Sandvik Steel Co. v. United States,* 164 F.3d 596, 600 (Fed. Cir. 1998).

### B.    <u>Legal Framework For Scope Rulings</u>

Commerce is often called upon to determine whether a certain product is included within the scope of an antidumping or countervailing duty order because it necessarily writes scope language in general terms. *See* 19 C.F.R. § 351.225(a). Commerce's determinations concerning

a particular product are made in accordance with its regulations.  Pursuant to 19 C.F.R.

§ 351.225(d), Commerce may make a scope ruling based on the information in the scope request

and the sources set forth in 19 C.F.R. § 351.225(k)(1).  If Commerce cannot reach a decision

based on the scope ruling request and (k)(1) sources, Commerce initiates a formal scope inquiry.

19 C.F.R. § 351.225(e).  Commerce is not required to initiate formal scope inquiries if it finds

that a product is within the scope of an order under the (k)(1) sources.

The first step in considering whether a product is within the scope of an order is to

consider the language of the order itself.  *Arcelormittal Stainless Belgium N.V. v. United*

*States,* 694 F.3d 82, 87 (Fed. Cir. 2012).  Commerce may decide that the language of the

order unambiguously applies to the product at issue, *id.*, or it may additionally consider the

descriptions of the merchandise contained in the (k)(1) sources.  *Tak Fat Trading Co. v.*

*United States,* 396 F.3d 1378, 1382-83 (Fed. Cir. 2005).  The (k)(1) sources are the petition,

the investigation, and determinations of Commerce (including prior scope determinations)

and the ITC.  19 C.F.R. § 351.225(k)(1).  If Commerce determines that the descriptions of

the merchandise contained in the (k)(1) sources are dispositive, Commerce issues a final

scope ruling as to whether the product falls within the scope of the order.  19 C.F.R.

§ 351.225(d); *see also Tak Fat Trading,* 396 F.3d at 1382.

Only when the (k)(1) sources are not dispositive will Commerce consider the five

criteria set forth in 19 C.F.R. § 351.225(k)(2): (1) the physical characteristics of the product;

(2) the expectations of the ultimate purchasers; (3) the ultimate use of the product; (4) the

channels of trade in which the product is sold; and (5) the manner in which the product is

advertised and displayed. 19 C.F.R. § 351.225(k)(2).

## II.    Commerce's Scope Determination Was Lawful

### A.    Commerce Reasonably Found That The Scope Was Ambiguous

Commerce's scope inquiry began with an examination of the plain scope language to determine whether it contains an ambiguity and, thus, is open to interpretation.  *ArcelorMittal*, 694 F.3d at 88; *see also* Appx2453.  Commerce first reviewed the text of the orders to answer the question whether trailer wheels manufactured using rims or discs from China (but not both) are in-scope.  The relevant scope language regarding third country processing reads as follows:

> The scope includes rims, discs, and wheels that have been further processed in a third country, *including, but not limited to*, the painting of wheels from China and *the welding and painting of rims and discs from China to form a steel wheel*, or any other processing that would not otherwise remove the merchandise from the scope of the Orders if performed in China.

*Orders*, 84 Fed. Reg. 45,952 (emphasis added).

Commerce reasoned that a plain reading of the scope "reflects that rims, discs, and wheels further processed in a third country are covered by the scope if such processing would not otherwise exclude these items had the processing occurred in China."  Appx2454.  In other words, Commerce concluded that the words "including, but not limited to" in the scope indicate "that the 'painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel' are non-exhaustive examples of included processing," but the "plain language does not address what varieties of processing may otherwise exclude a product from the scope."  Appx2454; Appx2796.  Therefore, Commerce found that the plain language of the scope did not unambiguously address Production Methods A and C (which feature wheels completed in a third country from a mix of rim and disc parts from China and a third country) such that it was necessary to consider other (k)(1) sources.

Plaintiffs disagree with Commerce's determination that the scope is ambiguous maintaining that the scope unambiguously covers only third country processing of "rims and discs" and thus excludes trailer wheels manufactured in a third country if only one of two of the components are of Chinese-origin.  Pl. Br. at 19.  Even accepting Plaintiffs' interpretation of the phrase "rims and discs from China" as requiring that *both* the rim and disc originate from China,[1] it does not follow that the scope unambiguously *excludes* rims *or* discs from China that are further processed into a wheel in a third country.  To the contrary, as Commerce explained in its Final Scope Ruling, the scope includes "rims and discs from China" as one non-exhaustive example of processing that may be covered by the scope.  Therefore, Commerce reasonably found that the scope was ambiguous with respect to whether it covered third country processing of rims *or* discs from China and what types of processing are included in the "included, but not limited to" language and turned to the (k)(1) sources to resolve this ambiguity.  In so doing,

---

[1]  Although Commerce did not conclude that the usage of "and" with respect to "rims and discs from China" could be interpreted as "rims *or* discs," Asia Wheel misconstrues the word "and" as always requiring a conjunctive reading.  Asia Wheel Br. at 19-20 (citing *Adams v. U.S. Forest Serv.*, 671 F.3d 1138, 1145 (9th Cir. 2012); *MacDonald v. Pan Am. World Airways, Inc.*, 859 F.2d 742, 746 (9th Cir. 1988)).  Asia Wheel's cases, even if binding, do not advance its cause.  In *Adams*, the court recognized that the statute was unambiguous and congressional intent was clear so there was no need to consider the disjunctive form of "and."  671 F.3d at 1145.  And the *MacDonald* majority sustained the disjunctive use of "and" under the arbitrary and capricious standard.  859 F.2d at 744-45.  Rather, binding precedent dispels Asia Wheel's "narrow view, that 'and' is used in a conjunctive sense in every statutory provision and that its existence is conclusive in determining which terms Congress intended to group together, conflicts with established jurisprudence."  *Cormorant Shipholding Corp. v. United States*, 617 F. Supp.2d 1270, 1279 (Ct. Int'l Trade 2009) (citing *Doughten Seed Co. v. United States*, 24 C.C.P.A. 258, 260 (1936)); *see also United States v. Pulsifer*, 39 F.4th 1018, 1022 (8th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023); *United States v. Jones*, 60 F.4th 230, 233 n.2 (4th Cir. 2023) (noting circuit split on usage of word "and" in criminal statute).

Commerce did not – as Plaintiffs assert – change the scope of the order or interpret it contrary to its terms.

**B.    When It Issued The Orders Commerce Explained That It Was Not Deciding Hypothetical Situations Such As Those In This Case**

Plaintiffs wrongly contend that Commerce determined during the investigations that wheels completed in a third country from a mix of rims and discs from China and a third county are out-of-scope and improperly recharacterized its scope analysis from the investigations in the Final Scope Ruling.  Rather, as explained below, Commerce's analysis of the (k)(1) sources is supported by substantial evidence and in accordance with law.

During the investigations, Commerce revised the scope language to include within the scope "rims and discs from China that have been further processed in a third country into finished steel wheels."  Appx80035-80036.  Although Commerce declined to modify the scope to expressly include wheels manufactured in a third country from rims or discs from China, it did not dictate that wheels manufactured from some other variation of Chinese rims or discs must be held to be out-of-scope.  To the contrary, Commerce stated that it "does not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country, if an interested party requests a scope ruling and/or to address a future circumvention concern."  Appx80022.  Thus, Commerce found "*at this time*, that the current scope language is clear that only if all constituent rims and disc parts to form a steel wheel are from China does the order apply *notwithstanding any analysis of substantial transformation*."  *Id.* (emphasis added).  In other words, Commerce held open the possibility that it might still find – with the benefit of further analysis – a steel wheel imported from a third country and manufactured using Chinese components to originate from China such that the orders would apply to that wheel.

Selectively quoting language from the investigation, plaintiffs contend that "the final scope language adopted by Commerce thus requires that both the rims and the discs 'must' originate from China for third country assembled wheels to be within scope" and that "trailer wheels manufactured in a third country with rims or discs from China – but not both – are outside the scope."  Pl. Br. at 22-23.  According to plaintiffs, Commerce agreed with this understanding of the third-country processing provision and declined to amend the scope as requested because it agreed that steel wheels assembled in third countries fall within scope only if both the rims and discs originate from China.  *Id*. at 23-24.

This overstates Commerce's response to Dexstar's late-stage requests to modify the scope to include Chinese "rims or discs" that have been further processed in a third country.  It is undisputed that Commerce declined to make the modification requested by Dexstar.  It is also undisputed that Commerce found that "the existing language sufficiently conveys the concept that third-country processing of a steel wheel must be of rims and discs produced in China" and thus declined importers' requests to further clarify the phrase "rims and discs" as it appears in the scope.  Appx80022.  But Commerce's statements in this regard addressed scope language referring to "rims and discs from China."  Commerce did not prejudge that wheels later determined to originate from China based on a substantial transformation analysis must be out-of-scope.  Instead, Commerce deferred decision on this issue, explaining that it did "not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country, if an interested party requests a scope ruling and/or to address a future circumvention concern."  *Id.*

Plaintiffs attempt to dismiss this clear and unequivocal statement, claiming that "whatever Commerce meant by 'a mix of rim and disc parts from China and a third country,' it

did not mean that wheels made in third countries from rims or discs from China (but not both) could potentially be covered by the scope, because Commerce expressly addressed this scenario during the investigations." Pl. Br. at 26. In other words, Plaintiffs assert that it was unreasonable for Commerce to interpret its reference in the investigations to a "mix of rim and disc parts from China" to refer to the very mix of rims and discs being discussed in the paragraph in which the sentence appears. Plaintiffs' interpretation of the Final Scope Investigation Determination lacks support.

In sum, Commerce reasonably interpreted its statements in the investigations to stand for the proposition that (1) wheels made in a third country from rims or discs from China, but not both, are not addressed by the explicit language of the scope and (2) Commerce intended to further evaluate coverage of such products based on case-specific factors at a later point in time as warranted. Appx2795. Therefore, based on its analysis of the 19 C.F.R. § 351.225(k)(1) sources – in particular, the final scope determination in the underlying investigation – Commerce reasonably decided to apply a substantial transformation analysis to determine country of origin for Asia Wheel's steel wheels manufactured under Production Methods A and C. Commerce's action is supported by substantial evidence as set forth above.

### C. Commerce Reasonably Determined That Asia Wheel's Steel Wheels Were Not Substantially Transformed By Processing In Thailand, And Thus Remained From China And Subject To The Orders

Commerce correctly determined that the subject wheels are in scope. Plaintiffs contend that the determination is not supported by substantial evidence and that Commerce did not

lawfully apply its substantial transformation criteria. [2]  Commerce followed its substantial

transformation practice, and its findings are supported by substantial evidence.

### 1.    Legal Framework for Substantial Transformation Analyses

The scope of an order is "defined by the type of merchandise and the country-of-origin"

and "therefore the determination of where the merchandise is produced or manufactured is a

fundamental step in the administration of the antidumping laws." *Advanced Tech & Materials*

*Co. v. United States*, 35 Ct. Int'l Trade 1380, 1384 (2011); *see also Ugine and ALZ Belgium,*

*N.V. v. United States*, 517 F. Supp. 2d 1333, 1345 (Ct. Int'l Trade 2007).

In determining country of origin, Commerce conducts substantial transformation

analyses.  "{S}ubstantial transformation occurs where, 'as a result of manufacturing or

processing steps ... {,} the {product} loses its identity and is transformed into a new product

having a new name, character and use.'" *Bell Supply Company LLC v. United States*, 888 F.3d

1228 (Fed. Cir. 2018) (*citing Bestfoods v. United States*, 165 F.3d 1371, 1373 (Fed. Cir. 1999)).

The Federal Circuit has sustained Commerce's "substantial transformation" analysis as a means

of assessing country of origin.  *Bell Supply*, 888 F.3d at 1229 (*citing E.I. DuPont De Nemours &*

*Company v. United States*, 8 F. Supp. 854, 858 (Ct. Int'l Trade 1998)) (noting that "in

determining if merchandise exported from an intermediate country is covered by an antidumping

order, Commerce identified the country of origin by considering whether the essential

component is substantially transformed in the country of exportation").

This Court and the Federal Circuit have explained that "{the} 'substantial transformation'

rule provides a yardstick for determining whether the processes performed on merchandise in a

---

[2]  Plaintiffs do not challenge Commerce's substantial transformation determination with respect
to Production Method C.  Pl. Br. at 27, n.4.

country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred." *Bell Supply*, 888 F.3d at 1229 (*citing DuPont*, 8 F. Supp. at 858).

For subject merchandise that is further processed in a third country before exportation to the United States, to determine the country of origin, Commerce normally considers: (1) whether, as a result of the manufacturing or processing, the product loses its identity and is transformed into a new product having a new name, character, and use; and (2) whether through that transformation, the new article becomes a product of the country in which it was processed or manufactured. Appx2789.

To determine whether a product is transformed, Commerce looks to factors such as (1) the class or kind of merchandise; (2) the product properties, essential component of the merchandise, and intended end-use; (3) the nature and sophistication of processing in the country of exportation; (4) the cost of production/value added; and (5) level of investment. *Id*. (citing among other things *Bell Supply*, 888 F.3d 1228-29).

### 2.    Commerce Lawfully Conducted Its Substantial Transformation Analysis

As explained above, Commerce considers factors such as (1) the class or kind of merchandise; (2) the nature and sophistication of processing in the country of exportation; (3) the product properties, essential component of the merchandise, and intended end-use; (4) the cost of production/ value added; and (5) level of investment. *Bell Supply*, 888 F.3d at 1228. Commerce considered the totality of these factors and determined that finished wheels processed in Thailand under Production Methods A and C are not substantially transformed such that the third-country processing confers country of origin, and therefore, that the country of origin of Asia Wheel's steel wheels is China. Appx2807, Appx2816-2817.

First, plaintiffs do not contest that the finished wheels exported from Thailand remained the same class or kind of product as Chinese-origin rims or discs.  Appx2458; Appx2807.  Second, with respect to the nature and sophistication of processing, Commerce found that the scope language indicates that wheel assembly, welding, and painting represent processing steps that would not otherwise remove the merchandise from the scope of the orders had they been performed in China because they are relatively minor in comparison to the production operations in China which produce the components themselves.  Appx2460, Appx2462; Appx2811.  Third, Commerce found that the wheels maintain their essential characteristics and end-use – to be incorporated into a specific finished wheel.  Appx2459-2460; Appx2808- 2810.  Fourth, Asia Wheel's investment into trailer wheel production is not comparable to the investment into production facilities involved in producing the components in China.  Appx2461; Appx2815-2817.  Further, the record reflected that the investment made in Thailand is highly dependent on expertise of the Chinese affiliate, which maintained substantial level of oversight over operations at the plaint in Thailand.  *Id*.  Lastly, the value added by the input steel and initial production steps in China establishes that production in China constitutes a significant portion of value added.  Appx2460-2462; Appx2813-2815.

Thus, Commerce's determination that that the totality of the factors weighed against finding the rims in Production Method A were substantially transformed is supported by substantial evidence.  Appx2462; Appx2816-2817. Plaintiffs do not dispute Commerce's use of the substantial transformation analysis to determine country of origin.  Instead, they contend that Commerce failed to answer "whether the Chinese-origin wheel component (a disc for Method A Wheels) became 'a new product having a new name, character{,} and use' in Thailand."  Pl. Br. at 27-29 (quoting *Bell Supply*, 888 F.3d at 1228; *DuPont*, 8 F. Supp. 2d at 857).  Plaintiffs further

contend that Commerce did not apply the correct legal standard in its analysis of name, character, and use as well as in its analysis of essential characteristics.  Contrary to Plaintiffs' contentions, Commerce addressed these arguments in its scope ruling.

When determining the scope of an order, "Commerce describes the class or kind of merchandise within the scope of the order in two parts – first, the type of merchandise, *i.e.*, its technical characteristics, and second, the merchandise's country of origin." *Canadian Solar, Inc. v. United States*, 918 F.3d 909, 913 (Fed. Cir. 2019).

Here, the products for which Asia Wheel requested a scope ruling included trailer wheels manufactured using a mix of discs from China and rims produced in Thailand from rectangular steel plates from China or a third country.  Appx2449; Appx2789.

Plaintiffs maintain that Commerce failed to apply the "new name, character, and use" framework to ask whether the essential qualities and function of the Chinese-origin rim or disc differ from the essential qualities and function of the finished wheel produced in Thailand.  Pl. Br. at 30-31.  However, Commerce explained that although it is sometimes relevant, "the new name, character, and use" standard is primarily used by CBP in its country-of-origin analysis. Appx2808; *see also Bell Supply*, 888 F.3d at 1228.  This Court has also noted the differences between Commerce and CBP's country-of-origin analyses, reasoning that "although the {Federal Circuit} speaks of the name, character or use test, it does not invoke any of the factors used in {CBP} cases and specifically states the factors Commerce considers to determine whether there has been a substantial transformation."  *Bell Supply*, 348 F. Supp. 3d at 1287, n.6.  Commerce also explained that adopting this standard as the "sole basis of analysis would result in even minor finishing/assembly operations sufficient to determine country of origin and render the

existing substantial transformation factors moot, which is not the intent of the reference to CBP's 'name, character, and use' analysis in *Bell Supply*."  Appx2809.

Accordingly, Commerce considered the totality of all five factors of the substantial transformation analysis which supported its finding that the further processing did not substantially transform the Production Method A wheels.  Appx2458-2462; Appx2807-2816.  In its Final Scope Ruling, Commerce explained that, while it may consider whether the third country processing imparted "a new name, character, and use" in consideration of the totality of circumstances, such findings may not supplant analysis of the record with respect to the remaining elements of the test.  Appx2807-2809.  In sum, Commerce correctly analyzed and applied the appropriate weight to the "name, character, and use" standard in its substantial transformation analysis.

Plaintiffs further take issue with Commerce's finding with respect to the "essential component" factor, claiming that it is unsupported by substantial evidence because a finished wheel requires both a rim and a disc to exhibit its essential characteristics and achieve its function.  Pl. Br. at 31.  Plaintiffs contend that, because the disc alone cannot function as a wheel, there must be substantial transformation of a Chinese-origin disc when the rim is affixed to it in Thailand.  *Id*.  They further contend that it was unreasonable to determine that a Chinese-origin discs exhibit the essential characteristics of finished wheels.  *Id*. at 27-28.

Plaintiffs' argument is similar to that made in *WorldPac*, where WorldPac filed a scope ruling request asking that Commerce determine whether a single tapered roller bearing set, incorporated into a completed wheel hub assembly manufactured in Germany from other non-Chinese parts, fell outside of the scope of the antidumping duty order on tapered roller bearings (TRB) and parts thereof, finished and unfinished, from China.  Tapered Roller Bearings and

21

Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Scope

Ruling on WorldPac Inc.'s Wheel Hub Assemblies, September 11, 2019 (*WorldPac*).

In *WorldPac*, Commerce found that the essential component of the merchandise is

substantially transformed in the country of exportation because the Chinese-TRB is incorporated

into a substantially different product such that the Chinese-TRB set no longer functions as a

single-acting TRB set, but rather, must function in unison with the Polish-TRB set and other

parts as part of the wheel hub assembly. *Id*. at 5. However, in that case, Commerce considered a

mix of subject and non-subject materials and Commerce cited the processing of "significant,

additional, non-subject materials" as contributing to its decision. *Id*. The assembly in this

proceeding is much simpler, utilizing only two major components, both otherwise subject to the

orders as components. Appx2459; Appx2809. Additionally, a disc or rim continues to function

as the only such component after incorporation into a finished wheel. *Id*. Unlike the TRBs in

*WorldPac*, a finished wheel does not make use of multiples of the same component, sourced

from different countries." *Id*.

The "key qualities" of a disc as identified in Asia Wheel's own case briefs are not

changed or otherwise transformed through processing: (1) the number, placement, and type of

bolt holes; (2) the mounting arrangement; and (3) the materials used to produce the disc.

Appx2459. For this factor, Commerce determined that the rims and discs each maintain their

essential characteristics and sole purpose of being incorporated into a finished wheel throughout

processing in Thailand. *Id*.; Appx2808-2809.

Therefore, the essential characteristics of the Production Method A wheels remain

unchanged throughout further processing in Thailand and thus, do not support a finding of

substantial transformation.  Further, Asia Wheel does not argue that any given component could be used to produce wheels that would not be covered by the scope.

Plaintiffs further contend that "{t}he question is not, however, the country of origin of the Chinese-origin wheel components.  Rather, the question is the country of origin of the finished trailer wheels imported into the United States."  Pl. Br. at 30.  Plaintiffs further assert that "the fundamental question is not whether the Chinese-origin component continues to have the qualities and function after processing in Thailand, but whether the essential qualities and function of the Chinese-origin disc differ from the essential qualities and function of the finished trailer wheel manufactured in Thailand and imported into the United States.  *Id*. at 30-31.

Both arguments fail to consider the relevance of examining the qualities, function, and origin of component parts as a part of Commerce's substantial transformation analysis.  This Court rejected a similar argument in *Peer Bearing*, where it considered whether unfinished and finished parts from China were substantially transformed into finished TRBs in Thailand.  *Peer Bearing Co.-Changshan v. United States*, 128 F. Supp. 3d 1286 (Ct. Int'l Trade 2015).  The Court explained that "Commerce was not precluded from taking into consideration the uncontested fact that the TRB production in Thailand was conducted upon parts, finished and unfinished, that ultimately were destined to become TRBs."  *Id*. at 1303.  Accordingly, Commerce reasonably considered whether the essential characteristics and purpose of the component steel wheel parts were changed by further processing in Thailand to determine the country of origin of the finished wheel.  Appx2807-2816.  Commerce correctly applied the relevant legal standard in determining that the Chinese-origin rims were not substantially transformed by processing in Thailand.

**D.    Commerce's Application Of Antidumping And Countervailing Duty Liability To The Entire Imported Wheel Is Supported By Substantial Evidence And In Accordance with Law**

Commerce lawfully imposed antidumping and countervailing liability to the entire finished wheel – because finished wheels are subject merchandise.  Contrary to the Federal Circuit's teaching in *Walgreen Co. of Deerfield, IL v. United States*, 620 F.3d 1350, 1356-57 (Fed. Cir. 2010) and other cases, plaintiffs ask the Court to begin its inquiry at the wrong point in the analysis.  Instead of first determining whether a product includes subject and non-subject parts and then applying its mixed media analysis to determine "how much" of the product should be dutiable, plaintiffs are beginning at the end, asking the Court to determine that some part of the entered product is not dutiable, when it has already been determined that the entire entered product is subject merchandise.  Plaintiffs' wheels are not a collection of subject and non-subject parts.  The finished wheels imported from Thailand are the exact type of merchandise contemplated by the scope of the orders.  *Orders*, 84 Fed. Reg. at 45,954 ("The scope includes rims and discs for certain on-the-road steel wheels, whether imported as an assembly, unassembled, or separately").  Because the wheels imported from Thailand are solitary articles, not a mix of subject and non-subject merchandise, and there was no question as to whether any part of the entered product should not be dutiable.  *Id*.

Nothing in the record supports plaintiffs' contentions that Commerce impermissibly expanded the scope of the orders and that there was no rational connection between the facts of this case and Commerce's scope ruling.  Pl. Br. at 32-34; *see also* Appx2827-2829.  During the underlying scope inquiry, Commerce examined three production methods, only one of which remains relevant to this claim, Production Method A (Asia Wheel does not challenge the substantial transformation analysis for Production Method C).  Production Method A concerns

trailer wheels manufactured using discs from China and rims produced in Thailand from rectangular steel plates from China or a third country.  During the inquiry, as discussed above, Commerce explained that a determination whether a product is subject to an order entails both an assessment of the product's physical characteristics and a country-of-origin determination. Appx2453; Appx2807-2810.  Commerce determined that a plain reading of the scope language reflects that rims, discs, and wheels further processed in a third country are in-scope if that processing would not otherwise exclude these items from the scope had the processing occurred in China.  Appx2454; Appx2807-2810.  Commerce elaborated that the plain language of the scope does not address what varieties of processing may otherwise exclude a product from the scope.  Appx2454; Appx2795-2796.

Because of this ambiguity in the scope, Commerce conducted a substantial transformation analysis to determine whether Production Method A substantially transformed Asia Wheel's steel wheels to the point where it would be appropriate to designate the finished wheel as originating from Thailand, rather than as a wheel originating from China.  As discussed above, Commerce conducted its substantial transformation analysis and determined that finished wheels processed in Thailand under Production Method A did not substantially transform such that the third-country processing confers a new country of origin.  Appx2807.  Because Commerce determined that Asia Wheels' steel wheels were not substantially transformed in Thailand, Commerce concluded that the scope language was dispositive and that the finished wheels were in-scope.

With this analytical framework in mind, plaintiffs' contentions with respect to what portion of the finished wheels should be subject to duties are unpersuasive lack substance because they fail to cite any binding or even persuasive authority suggesting that their approach

is correct. To start, Commerce has not interpreted the orders contrary to their terms. Pl. Br. at 32

(citing *Eckstrom Industries, Inc. v. United States.*, 254 F.3d 1068, 1072 (Fed. Cir. 2001). In

*Eckstrom*, the Court had remanded a scope determination to Commerce after it held that the

agency had impermissibly expanded the scope. *Eckstrom*, 254 F.3d at 1072. The order at issue

in *Eckstrom* contained the following relevant scope language:

> The products subject to this investigation are certain stainless steel
> butt-**weld** pipe fittings, whether finished or unfinished, under 14
> inches inside diameter.

> Certain **welded** stainless steel butt-**weld** pipe fittings (pipe fittings)
> are used to connect pipe sections in piping systems where
> conditions require **welded** connections.

*Id.* at 1070 (citation omitted) (emphases added). The Court explained that Commerce's

"interpretation of the order as covering *any* stainless steel butt-welded pipe fittings" ignored the

language of the scope that indicated it applied only to "*welded*" pipe. *Id.*

Here, unlike *Eckstrom*, Commerce did not contradict express scope language, nor did it

expand the scope to encompass goods that were never contemplated by the scope. In relevant

part, the scope provides:

> The scope includes rims, discs, and wheels that have been
> further processed in a third country, including, but not limited
> to, the painting of wheels from China and the welding and
> painting of rims and discs from China to form a steel wheel,
> or any other processing that would not otherwise remove the
> merchandise from the scope of the orders if performed in China.

*Orders*, 84 Fed. Reg. at 45,954.

Despite plaintiffs' contentions that Commerce impermissibly expanded the scope, the

agency relied on express third country processing language in the scope, coupled with its

substantial transformation analysis, to find that the wheel components processed in Thailand

were not "further processed in a third country" to the point to being rendered out-of-scope.

Appx2827-2829.  None of the other cases that plaintiffs cite have any bearing on whether Commerce should impose liability on the entire imported article, nor do they demonstrate that Commerce's analysis in this case was incorrect.  *See* Pl. Br. at 32-34 (citing *Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172, 1183 (Ct. Int'l Trade 2004); *Mitsubishi Elec. Corp. v. United States*, 802 F. Supp. 455, 460 (Ct. Int'l Trade 1992); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. et al., v. State Farm Mutual Automobile Insurance Company et al.*, 463 U.S. 29, 43 (1983); *Chr. Bjelland Seafoods A/S v. United States*, 19 C.I.T. 35, 37 (1995); *USX Corp. v. United States*, 655 F. Supp. 487, 492 (Ct. Int'l Trade 1987)).

None of these cases support plaintiffs' liability argument.  Instead, they are examples of legal principles relating to scope determinations or cases in which the Court held that Commerce had misinterpreted the scope of an order.  For example, in *Allegheny* and *Mitsubishi*, the Court determined that Commerce's scope determinations contradicted express language in the scope.  *Allegheny*, 342 F. Supp. 2d at 1185-86; *Mitsubishi*, 802 F. Supp. at 460-61.  In contrast, Commerce followed the express language of the scope here.

In *Allegheny*, Commerce had found that plaintiff Top Line's non-beveled pipe fittings in-scope.  However, the scope in *Allegheny* contained the following scope language: "The edges of finished pipe fittings are beveled."  *Amended Final Determination and Antidumping Duty Order: Certain Welded Stainless Steel Butt-Weld Pipe Fittings from Taiwan*, 58 Fed. Reg. 33,250 (Dep't of Commerce June 16, 1993).  The Court held that, because the scope included "finished" or "unfinished" pipe, and there was no evidence that Top Line's non-beveled pipe fittings were unfinished, covering them under the scope of the order contradicted the express language of the scope that "finished pipe fittings are beveled." *Allegheny*, 342 F. Supp. at 1190.

Similarly, in *Mitsubishi*, the Court held that Commerce had impermissibly expanded the scope of the order when it found certain radio frequency power semiconductors to be subassemblies of cellular mobile telephones within the scope of the order on cellular mobile telephones and subassemblies. *Mitsubishi*, 802 F. Supp. at 461. The Court reasoned that Commerce ignored a mandatory scope criterion that subassemblies must be "dedicated *exclusively* for use in CMT transceivers or control units" where Mitsubishi's subassemblies were, in fact, capable of functioning in other devices that were not CMT transceivers. *Mitsubishi*, 802 F. Supp. at 458. The Court further explained that, requiring Mitsubishi to proffer information to establish actual use of its subassemblies in the production of non-CMT devices in the United States, impermissibly added a scope requirement absent from the scope language. *Id.* at 461-62.

Plaintiffs' remaining cases do not reflect the facts of this case. *Motor Vehicle Mfrs Ass'n*, 463 U.S. at 34, discussed the arbitrary and capricious standard contained at 5 U.S.C. § 706. Nor does Asia Wheel attempt to compare *Motor Vehicle Mfrs Ass'n* with the agency action here. Likewise, neither *Bjelland* nor *USX Corp.* discuss issues regarding the scope of an order, let alone whether only portions of the imported article should be subject to duty liability. Pl. Br. at 37 (quoting *USX Corp.*, 455 F. Supp. at 492). Plaintiffs fail to cite any relevant authority.

Commerce did, however, discuss controlling precedent on its authority to determine whether it should impose duty liability only on a portion of the imported article. *See* Apxx2828-2829 (citing *Bell Supply*, 888 F.3d at1230; *Walgreen*, 620 F.3d at 1356-57; *Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357 (Ct. Int'l Trade 2021), *aff'd*, 65 F.4th 1351 (Fed. Cir. 2023))).

The Federal Circuit has addressed Commerce's scope determinations with respect to imported articles that contain both subject and non-subject merchandise, explaining that

Commerce correctly found based on the facts of that case "that the components of the gift bag sets did not interact in any way or otherwise represent a unique product. Having so concluded, it then properly determined, based on the (k)(1) criteria and the language of the Final Order, that the tissue paper contained in the gift bag sets fell within the scope of the antidumping order." *Walgreen*, 620 F.3d at 1356-57. Similarly, the finished wheels coming from Thailand do not represent a unique product that is outside the scope the order. To be sure, as discussed above, Commerce's scope determination relied upon express third country processing language, coupled with its substantial transformation analysis, when it determined that the "steel wheels exported from Thailand {} are solitary articles plainly covered by the scope of the *Orders*." Appx2829. There is no express scope language carving out from the scope any specific parts of a wheel that have been determined to be subject to the scope. *Orders*, 84 Fed. Reg. at 45,954 ("The scope includes rims and discs for certain on-the-road steel wheels, whether imported as an assembly, unassembled, or separately"). Plaintiffs have not cited authority that supports their position that Commerce should impose duty liability on only a portion of the imported article that is subject to the scope, despite express scope language covering third country processing.

Moreover, plaintiffs do not contest Commerce's mixed media analysis (and thus have waived any criticism). Appx2829. Commerce's practice is to conduct mixed media analyses for merchandise that includes both subject and non-subject merchandise to determine whether to apply the duty to the entire product or only a portion. *Id.*; *see generally* Appx2542-2543. In *Mid Continent*, the Federal Circuit set forth Commerce's authority to conduct this analysis, even when scope language does not expressly mention mixed-media items:

> The interpretive process for a scope determination relating to mixed media items necessarily involves two steps. {1} First, Commerce must determine whether the potentially-subject merchandise included within the mixed media item is within

29

the literal terms of the antidumping order.  **{2}**  If it is, then
Commerce must determine whether the inclusion of that
merchandise within a mixed media item should nonetheless
result in its exclusion from the scope of the order.

*Mid Continent Nail Corp. v. United States.*, 725 F.3d 1295, 1301-02 (Fed. Cir. 2013) (*Mid*

*Continent*); *see also* Appx2829 (citing *Mid Continent*, 725 F.3d at 1298).  Accordingly, the whole

wheel is subject merchandise and duties should be assessed on that subject merchandise.

> **E.    Commerce Provided Lawful Notice That Wheels Produced In Third
> Countries From Chinese Origin Components Could Be Subject Merchandise**

Plaintiffs contend that suspension of liquidation is impermissible before the date of

initiation because they did not receive adequate notice that their merchandise could have been

subject merchandise before that date, March 21, 2021.  Pl. Br. at 34-45.  Contrary to plaintiffs'

claims, Commerce gave adequate notice when it instructed CBP to continue the suspension of

liquidation for products found to be covered by the orders if already suspended, and if not

already suspended, to suspend liquidation of entries of products found to be covered effective to

the date of initiation.  Appx2821.

As an initial matter, Commerce provided adequate notice and warning regarding

merchandise produced pursuant to production methods A and C, generally, in the underlying

investigation:

> {Commerce} does not foreclose a further analysis of substantial
> transformation should a product be completed in a third country
> from a mix of rim and disc parts from China and a third country, if
> an interested party request a scope ruling and/or to address a future
> circumvention concern.

Appx80022.  Commerce's express statement that future merchandise may be the subject of a

future scope inquiry, including a substantial transformation analysis, conveyed sufficient notice

to any reasonably informed importer.  Appx2821-2822 (citing *Tai-Ao Aluminum (Thaishan) Co.,*

*Ltd. v. United States*, 983 F.3d 487, 495 (Fed. Cir. 2020)).  As discussed above, merchandise

produced by Production Methods A and/or C is precisely the merchandise contemplated by the

scope language "{products} completed in a third country from a mix of rim and disc parts from

China and a third country."  Appx80022.  Relying on this express language from the

investigation, Commerce acted in accordance with law when it ordered CBP to suspend

liquidation to the date of initiation.  *Id.*; *see also* Appx2821.  In fact, the Importers'

administrative case brief at 24-25 concludes by acknowledging that "The March 2021 date of

initiation constitutes the earliest possible date for {antidumping duty and countervailing duty}

liability to attach to the Importers' trailer wheels produced by Asia Wheel under Production

Methods A and C."  Appx2821 (Appx2541-2542).

Despite this adequate notice of potential duty liability, plaintiffs misapprehend several

cases that they claim demonstrate that Commerce did not provide adequate notice.  Pl. Br. at 34-

40 (citing *Trans Texas Tire, LLC v. United States*, 519 F. Supp. 3d 1289, 1304-05 (Ct. Int'l Trade

2021); *Tai-Ao*, 983 F.3d at 495).

In *Trans Texas Tire*¸ the plaintiffs raised two primary arguments:  (1) Commerce's

determination that certain chrome wheels were covered by the scope of the order was unlawful

and (2) Commerce improperly assessed antidumping duties retroactively to the preliminary

determination date without adequate notice.  *Trans Texas Tire*, 519 F. Supp.3d at 1283.  The

underlying scope question was whether the wheels were covered under an exclusion in the

order's scope that "{e}xcluded from this scope are . . . certain on the road steel wheels that are

coated entirely with chrome."  *Id.* at 1281.  After several parties requested that Commerce clarify

whether this exclusion included plaintiff's chrome wheels, Commerce published a preliminary

scope ruling on April 15, 2019, and published its final scope ruling on July 1, 2019.  Commerce

did not clarify whether plaintiff's chrome wheels were covered under the scope of the order until its final scope ruling, 11 months after it initiated the investigation. *Id*. The Court in *Trans Texas Tire* sustained Commerce's authority to "alter the scope of the investigation until the final order," however, it disagreed with Commerce's decision to suspend entries going back to the date of Commerce's preliminary scope ruling. *Id.* at 1284 (citations omitted). The Court explained that, although Commerce's scope determination in the proceeding was correct, Commerce failed to provide adequate notice that plaintiff's chrome wheels would not fall within the chrome coated exclusion until it published its final scope ruling. *Id*.

Unlike in *Trans Texas Tire*, Commerce provided adequate notice in the original investigation that merchandise "completed in a third country from a mix of rim and disc parts from China and a third country" may be subject merchandise, and there is no dispute that the finished wheels imported from Thailand are precisely the type of merchandise, coupled with Commerce's substantial transformation analysis, contemplated by the orders' scope. Appx80020-80022; Appx2822-2823.

Plaintiffs' reliance on *Tai-Ao* is also misplaced. Pl. Br. at 34-40. In *Tai-Ao*, Commerce initiated an anti-circumvention inquiry into aluminum extrusions. 983 F.3d at 490-91 (citing *Aluminum Extrusions from the People's Republic of China: Initiation of Anti-Circumvention Inquiry*, 81 Fed. Reg. 15,039, 15,042 (Dep't of Commerce Mar. 21, 2016)). The anti-circumvention initiation notice in *Tai-Ao* set forth its own limited coverage that did not include plaintiff's imports:

> This anti-circumvention inquiry covers extruded aluminum products that meet the chemical specifications for 5050-grade aluminum alloy, which are heat-treated, and **exported by Zhongwang**.

> **The Department intends to consider whether the inquiry
> should apply to all imports** of extruded aluminum products that
> meet the chemical specifications for 5050-grade aluminum alloy
> and are heat-treated, regardless of producer, exporter, or importer,
> from the PRC.

81 Fed. Reg. at 15,042 (emphasis added). Commerce initiated the anti-circumvention inquiry for

only one company, Zhongwang. *Id*. At the time of initiation, while Commerce did say that it

intended to consider whether its inquiry might apply to all imports of extruded aluminum, no

other company was subject to the inquiry. *Id*. However, following its preliminary anti-

circumvention determination, Commerce released the following language via a notice in the

Federal Register:

> The products covered by this inquiry are heat-treated
> extruded aluminum products that meet the chemical
> specifications for 5050-grade aluminum alloy (inquiry
> merchandise), **regardless of producer, exporter, or
> importer, from the PRC**.

*See Tai-Ao*, 983 F.3d at 492 (citing *Aluminum Extrusions from the People's Republic of China:*

*Affirmative Preliminary Determination of Circumvention*, 81 Fed. Reg. 79,444, 79,445 (Dep't of

Commerce Nov. 14, 2016)) (emphasis added). The Court held that, because Commerce's

*initiation* was not country-wide, the first notice that came to all other producers, exporters, or

importers, besides Zhongwang, that their merchandise may be subject to Commerce's anti-

circumvention inquiry, came on the date of Commerce's preliminary anti-circumvention

determination. *Tai-Ao*, 983 F.3d at 495-96. The Court explained that "the regulations require

that Commerce's Initiation Notice include '{a}n explanation of the reasons for {Commerce's}

decision to initiate a scope inquiry.'" *Id.* at 496 (quoting 19 C.F.R. § 351.225(f)(1)(ii)). The

Court noted that Commerce had only issued a questionnaire to Zhongwang, which further did not

put any other company on notice that it might be subject to the anti-circumvention inquiry until after the issuance of the preliminary determination. *Id.*

In contrast to *Tai-Ao*, Commerce provided notice to parties that their merchandise may be covered pursuant to the original investigation. Appx80020-80022; Appx2822-2823. And Asia Wheel and its products were plainly identified at all points in this inquiry, from Commerce's initial investigation, CBP's EAPA proceeding begun in 2020, CBP's referral of 2021, and the 2022 initiation notice. And the merchandise subject to this scope inquiry was of the exact type of merchandise identified in the orders.

Finally, plaintiffs contend that Commerce's instructions to CBP to continue its prior suspension of liquidation under EAPA was unlawful because importers lacked fair warning that wheels manufactured in a third country with rims *or* discs from China were potentially within the scope until March 22, 2021. Pl. Br. at 40-45. Apart from the actual notice plaintiffs received, which readily disposes of this issue, CBP suspends liquidation under 19 U.S.C. § 1517(e) interim measures based on its own authority, not that of Commerce. Commerce has no authority to direct CBP decisions entrusted to that agency by Congress in EAPA. Asia Wheel cites no authority permitting such an intrusion into CBP's domain. Appx2824. While Commerce did direct CBP to continue suspension of liquidation for Production Methods A and C wheels as of March 22, 2021, Commerce lacks authority to override CBP's separate EAPA authority. *Id.*

*Sunpreme Inc. v. United States*, 946 F.3d 1300 (Fed. Cir. 2020), does not advance plaintiffs' arguments. Plaintiffs latch onto a sentence that they contend stands for the proposition that CBP may only suspend liquidation when it has concluded that a product falls within ambiguous scope language and, because CBP had referred the matter to Commerce, CBP has not made the requisite finding determination. Pl. Br. at 44 (citing *Sunpreme*, 946 F.3d at 1321).

34

But unlike *Sunpreme*, where CBP exercised its inherent authority to collect duties, 946 F.3d at 1320-21, CBP suspended liquidation in this matter during its own EAPA proceeding, because it had found a "reasonable suspicion" of evasion.  19 U.S.C. § 1517(e).  Accordingly, contrary to plaintiffs' contentions, in an EAPA proceeding, CBP need not affirmatively find that a product is within the scope of an order.  All it need do is have a "reasonable suspicion" of evasion, 19 U.S.C. § 1517(e), before it shall "suspend the liquidation of each unliquidated entry of such covered merchandise that entered on or after the date of the initiation of the {EAPA} investigation."  19 U.S.C. § 1517(e)(1).

Indeed, in *Diamond Tools*, a case involving a similar CBP referral to Commerce to assess the scope of a subject product, the Court made clear that CBP's authority moves on an entirely different track than Commerce's.  The Court explained that Commerce's actions under its own statutes do not "diminish Customs' authority under the EAPA to apply Commerce's affirmative covered merchandise determination to all entries covered by the EAPA investigation."  *Diamond Tools Tech. LLC v. United States*, 545 F. Supp. 3d 1324, 1351 (Ct. Int'l Trade 2021).  And as a result, it sustained the earlier suspension date imposed under EAPA interim measures as opposed to the later date under Commerce's parallel proceeding.

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain the challenged scope ruling.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ L. MISHA PREHEIM
Assistant Director

/s/ STEPHEN C. TOSINI
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-5196
Fax: (202) 305-2062
Email: stephen.tosini@usdoj.gov
Attorneys for Defendant

OF COUNSEL:

BRISHAILAH BROWN
Attorney
Office of the Chief Counsel for Trade
Enforcement and Compliance
United States Department of Commerce

March 8, 2024

## CERTIFICATE OF COMPLIANCE

Pursuant to paragraph 2(B)(2) of the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in paragraph 2(B)(1)(b) of the Chambers Procedures for a filing under Rule 56.2(h). Specifically, excluding those exempted portions of the brief as set forth in paragraph 2(B)(1) of the Chambers Procedures, I hereby certify that this brief contains 10,626 words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

<u>/s/ Stephen C. Tosini</u>